IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:24-CV-275-D

| | |
|---|---|
| NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) **ORDER** ) |
| ALAN HIRSCH, et al., | ) ) |
| Defendants. | ) ) |

On October 2, 2023, the North Carolina Alliance for Retired Americans ("the Alliance" or "plaintiff") filed a complaint in the United States District Court for the Middle District of North Carolina against the six members of the North Carolina State Board of Elections in their official capacities (collectively "the Board defendants") alleging that the 30-day durational residency requirement in N.C. Gen. Stat. § 163-55(a) and N.C. Const. art. VI, § 2, para. 1 ("the 30-day durational residency requirement") violates Section 202 of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10502, and the First and Fourteenth Amendments of the United States Constitution [D.E. 1]. On October 16, 2023, the President pro tempore of the North Carolina Senate Philip E. Berger and Speaker of the North Carolina House of Representatives Timothy K. Moore (collectively "the legislative defendants") moved to intervene as defendants [D.E. 22].

On January 2, 2024, the Alliance filed an amended complaint [D.E. 32], moved for a preliminary injunction enjoining enforcement of the 30-day durational residency requirement [D.E. 33], and filed a memorandum in support [D.E. 34]. On January 16, 2024, the legislative defendants moved to dismiss the Alliance's amended complaint or, alternatively, to transfer the

action to this court [D.E. 37]. On January 17, 2024, the legislative defendants filed a memorandum in support [D.E. 38]. On January 23, 2024, the legislative defendants responded in opposition to the Alliance's motion for a preliminary injunction [D.E. 40]. On January 26, 2024, the United States District Court for the Middle District of North Carolina granted the legislative defendants' motion to intervene [D.E. 41]. On February 6, 2024, the Board defendants responded in opposition to the Alliance's motion for a preliminary injunction [D.E. 43]. On the same day, the Alliance responded in opposition to the legislative defendants' motion to dismiss or to transfer [D.E. 45]. On February 20, 2024, the legislative defendants replied in support of their motion to dismiss or to transfer [D.E. 47]. On the same day, the Alliance replied in support of its motion for a preliminary injunction [D.E. 48].

On February 20, 2024, the Alliance moved to consolidate a preliminary injunction hearing with a trial on the merits [D.E. 49]. On March 12, 2024, the legislative defendants responded in opposition [D.E. 50]. On March 26, 2024, the Alliance replied [D.E. 52].

On May 16, 2024, the United States District Court for the Middle District of North Carolina granted the legislative defendants' motion to transfer and transferred the action to this court [D.E. 54]. On May 23, 2024, the parties jointly filed a status report noting the three motions that are ripe for this court's review: the Alliance's motion for preliminary injunction [D.E. 33], the legislative defendants' motion to dismiss the Alliance's amended complaint [D.E. 37], and the Alliance's motion to consolidate [D.E. 49]. As explained below, the court grants the legislative defendants' motion to dismiss, dismisses without prejudice the Alliance's amended complaint, denies the Alliance's motion for a preliminary injunction, and dismisses as moot the Alliance's motion to consolidate.

2

I.

The Alliance is a 501(c)(4) nonprofit organization incorporated in North Carolina. See Am. Compl. [D.E. 32] ¶ 16. It is a chartered state affiliate of the Alliance for Retired Americans, which is a nationwide organization. See id. The Alliance alleges that its mission is to "ensure social and economic justice and full civil rights for retirees." Id. The Alliance has approximately 52,000 members in North Carolina. See id. Between January 2020 and November 2023, the Alliance "gained an average of 300 members every month." Id. at ¶ 17.

In North Carolina, a voter must meet certain criteria to qualify to vote. See id. at ¶ 22. A voter, inter alia, "must have resided in the State of North Carolina and in the precinct in which the person offers to vote for 30 days next preceding an election." Id. (quotation omitted); see N.C. Gen. Stat. § 163-55(a); N.C. Const. art. VI, § 2, para. 1. "In order to register to vote, voters must attest to meeting this residency requirement on their registration forms." Am. Compl. ¶ 24. North Carolina subjects citizens to felony penalties if they falsely or fraudulently attest on their registration forms to meeting North Carolina's voting eligibility requirements. See id. at ¶¶ 25, 30. North Carolina allows voters to register until 25 days before an election. See id. at ¶ 28; N.C. Gen. Stat. § 163-82.6(d). If a voter misses the 25-day registration cutoff, the voter may register to vote through same-day registration during early voting, which begins 20 days before the election and ends the Saturday before the election. See Am. Compl. ¶ 29; N.C. Gen. Stat. § 163-166.40(b). A prospective voter, however, who "moves to North Carolina, or to a new county or precinct within North Carolina, within 30 days of election day . . . cannot truthfully make the required attestations to register to vote at their new place of residence." Am. Compl. ¶ 31.

3

## II.

### A.

The legislative defendants move to dismiss the Alliance's amended complaint for lack of standing. See [D.E. 38] 13–17; [D.E. 40] 12–16. "Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" Murthy v. Missouri, 144 S. Ct. 1972, 1985 (2024); see U.S. Const. art. III, § 2. "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." Raines v. Byrd, 521 U.S. 811, 818 (1997) (quotation omitted); see Simon v. E. Ky. Welfare Rts. Org., 426 U.S. 26, 37 (1976). "A proper case or controversy exists only when at least one plaintiff establishes that [it] has standing to sue." Murthy, 144 S. Ct. at 1985 (cleaned up). "At the preliminary injunction stage, . . . the plaintiff must make a clear showing that [it] is likely to establish each element of standing." Id. at 1986 (quotations omitted).

An organization can show that it has standing to sue in its own right ("organizational" standing) or on behalf of its members ("associational" standing). See, e.g., Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 199 (2023) ("SFFA"); S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC, 713 F.3d 175, 182 (4th Cir. 2013).[1] The Alliance claims both types of standing. See Am. Compl. ¶ 17; [D.E. 45] 9–16. The legislative defendants argue the Alliance has neither type of standing. See [D.E. 38] 13–17; [D.E. 47] 7–10.

---

[1] Courts sometimes use the term "organizational" standing interchangeably with "associational" standing. See, e.g., SFFA, 600 U.S. at 199. Here, the parties and the court use "organizational" standing to refer to the Alliance's standing in its own right.

Case 5:24-cv-00275-D-RJ   Document 64   Filed 07/19/24   Page 4 of 34

1.

As for associational standing, the Alliance has standing to sue on behalf of its members so long as "[1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Friends of the Earth, Inc. v. Laidlaw Env't Srvs. (TOC), Inc., 528 U.S. 167, 181 (2000); Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977); see FDA v. All. for Hippocratic Med., 602 U.S. 367, 398 (2024) (Thomas, J., concurring). Courts use this test when an organization asserts section 1983 claims on behalf of its members. See, e.g., Md. Highways Contractors Ass'n, Inc. v. Maryland, 933 F.2d 1246, 1251–53 (4th Cir. 1991). Under the first requirement, the Alliance has standing if it: (1) proves that its members "have suffered an injury in fact—an invasion of a legally-protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) shows "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"; and (3) shows that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" from the court. Chambers Med. Techs. of S.C., Inc. v. Bryant, 52 F.3d 1252, 1265 (4th Cir. 1995) (cleaned up); see TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021); Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016); Laidlaw, 528 U.S. at 180–81; Lujan v. Defs. of Wildlife, 504 U.S. 555, 559–61 (1992); Sierra Club v. U.S. Dep't of Interior, 899 F.3d 260, 282–83 (4th Cir. 2018).

The Alliance alleges that North Carolina's 30-day "Durational Residency Requirement harms new members of the Alliance who move to North Carolina or existing members of the

5

Alliance who move to a new county or precinct in North Carolina within the month leading up to any federal election." Am. Compl. ¶ 17. "[P]laintiff-organizations [must] make specific allegations establishing that at least one <u>identified</u> member had suffered or would suffer harm" in order to claim associational standing. <u>Summers v. Earth Island Inst.</u>, 555 U.S. 488, 498 (2009) (emphasis added); <u>see Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.</u>, 983 F.3d 671, 683 (4th Cir. 2020); <u>S. Walk</u>, 713 F.3d at 184; <u>N.C. State Conf. of NAACP v. N.C. State Bd. of Elections</u>, 283 F. Supp. 3d 393, 400 (M.D.N.C. 2017). The Alliance fails to identify any current member of its organization who will be harmed by the 30-day durational residency requirement. <u>Cf.</u> [D.E. 45] 11 (arguing "[n]o such member-identification requirement applies"). None of the Alliance's "approximately 52,000 members across North Carolina" will be harmed by the requirement that a prospective voter must live in North Carolina for 30 days before an election to vote in North Carolina. Am. Compl. ¶ 16. The Alliance does not identify any of those members who will move to a new precinct in North Carolina within 30 days of Election Day 2024. Thus, the Alliance fails to show that any of its members "face a real and immediate threat" of injury. <u>Murthy</u>, 144 S. Ct. at 1986 (quotation omitted).

To the extent the Alliance relies on "new members who will join the Alliance," [D.E. 45] 11, the Alliance seeks to sue on behalf of non-members. Absent third-party standing, the Alliance cannot sue on behalf of nonmembers simply by deeming them potential future members. <u>Cf. Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.</u>, 280 F.3d 278, 287 (3d Cir. 2002); <u>Conservative Baptist Ass'n of Am., Inc. v. Shinseki</u>, 42 F. Supp. 3d 125, 133–34 (D.D.C. 2014). The Alliance does not argue it has third-party standing. <u>Cf. Sessions v. Morales-Santana</u>, 582 U.S. 47, 57 (2017) (requiring, for third-party standing, a "close relationship with the person who possesses the right" to sue and "a hindrance to the possessor's ability to protect his own interests"

6

(quotations omitted)). Moreover, the Alliance does not identify any specific individuals who will move to North Carolina, become members of the Alliance within 30 days of Election Day 2024, and desire to vote in North Carolina in the 2024 elections. Accordingly, the Alliance cannot assert associational standing.

In opposition to this conclusion, the Alliance argues that it "need not identify individual members" who will be harmed because its amended complaint "supports a reasonable inference that individual members would suffer harm absent" a preliminary injunction and cites three cases. [D.E. 45] 11–12 (quotations omitted); see All. for Hippocratic Med. v. U.S. Food & Drug Admin., 78 F.4th 210, 234 (5th Cir. 2023), rev'd, 602 U.S. 367 (2024); Nat'l Council of La Raza v. Cegavske, 800 F.3d 1032, 1041 (9th Cir. 2015); Democratic Party of Va. v. Brink, 599 F. Supp. 3d 346, 355 n.10 (E.D. Va. 2022). The requirement, however, "of naming the affected members has never been dispensed with in light of statistical probabilities, but only where all the members of the organization are affected by the challenged activity." Summers, 555 U.S. at 498–99 (emphasis in original); see N.C. State Conf. of NAACP, 283 F. Supp. 3d at 402 n.6. Moreover, none of the Alliance's cited cases help the Alliance. In Alliance for Hippocratic Medicine, the Supreme Court reversed the Fifth Circuit's decision and held that the plaintiffs failed to establish standing. See All. for Hippocratic Med., 602 U.S. at 396–97. In Democratic Party of Virginia, the district court purported to rely on Alabama Legislative Black Caucus v. Alabama, 575 U.S. 254 (2015), and held that "a prominent political organization need not identify individual members so long as a reasonable inference can be drawn that such individuals exist." Democratic Party of Va., 599 F. Supp. 3d at 355 n.10. In Alabama Legislative Black Caucus, however, the Supreme Court held that the district court erred by sua sponte dismissing a case for lack of standing instead of "giv[ing] the Conference an opportunity to provide evidence of member residence." Alabama

**7**

Legis. Black Caucus, 575 U.S. at 271. Furthermore, the plaintiffs in that case provided the Court with a list of its members, which satisfied the Court that the district court could consider the individual members' residences on remand. See id. Thus, this court rejects the Democratic Party of Virginia court's interpretation of Alabama Legislative Black Caucus that would allow statistical standing. In Summers, the Supreme Court "rejected" the Ninth Circuit's approach in National Council of La Raza. N.C. State Conf. of NAACP, 283 F. Supp. 3d at 402 n.6. Accordingly, the court rejects the Alliance's argument concerning statistical standing and concludes that the Alliance lacks associational standing. See, e.g., id. at 401–02.

Alternatively, even if the court credited the Alliance's argument concerning statistical standing and the Alliance's ability to sue on behalf of non-members, the Alliance's statistical evidence fails to support standing. The Alliance alleges that "between January 2020 and November 2023, the Alliance gained an average of 300 members every month." Am. Compl. ¶ 17; see [D.E. 33-1] ¶ 6. Thus, according to the Alliance, it probably will gain 300 new members within a month of Election Day 2024 who are "voters" and "would otherwise vote in North Carolina [but] will be unable to do so." [D.E. 34] 11–12; see [D.E. 45] 11.

The Alliance's lone statistic, 300 new members per month, tells the court nothing about whether those members are "voters" who would "vote in North Carolina [but] will be unable to do so." [D.E. 34] 11–12. For example, the Alliance does not explain how many of those 300 new members are out-of-state retirees who will join the Alliance when they move to North Carolina versus how many are North Carolinians who will join the Alliance when they retire. The 30-day durational residency requirement may bar the former from voting in the 2024 elections in North Carolina, but not the latter. Moreover, retirees in the former group may choose not to try to vote in 2024 in North Carolina within a month of moving to North Carolina. Thus, the Alliance's

8

statistic fails to tell the court how many potential future members of the Alliance face a "certainly impending" injury or a "substantial risk" of injury because of the 30-day durational residency requirement. Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (quotations omitted). Accordingly, the Alliance's associational standing argument is "entirely speculative," and the Alliance lacks associational standing. Murthy, 144 S. Ct. at 1993; see Chambers Med. Techs. of S.C., 52 F.3d at 1265.

2.

For organizational standing, a plaintiff-organization "must adequately allege that (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." S. Walk, 713 F.3d at 182 (quotations omitted); see All. for Hippocratic Med., 602 U.S. at 393–94; Laidlaw, 528 U.S. at 180–81.

The Alliance alleges that the 30-day durational residency requirement "undermines the Alliance's get-out-the-vote work in North Carolina and its advocacy work on other public policy issues" by "systematically preventing many of the Alliance's members from voting in North Carolina or in their new voting precinct, . . . making the Alliance less effective in furthering its mission than it otherwise would be." Am. Compl. ¶ 18; see also [D.E. 34] 13–14; [D.E. 45] 14; [D.E. 48] 9–10.

Under Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982), "[a]n organization may suffer an injury in fact when a defendant's actions impede its efforts to carry out its mission." Lane v. Holder, 703 F.3d 668, 674 (4th Cir. 2012). The Supreme Court, however, has held that "Havens was an unusual case" which the "Court has been careful not to extend" beyond the case's

9

facts. All. for Hippocratic Med., 602 U.S. at 396. Thus, a plaintiff-organization "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." Id. at 394. Moreover, a plaintiff-organization does not have standing just because it "diverts its resources in response to a defendant's actions." Id. at 395. Rather, a plaintiff-organization must show that the defendant's "actions directly affected and interfered with [plaintiff's] core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." Id. Moreover, "an injury to organizational purpose, without more, does not provide a basis for standing." S. Walk, 713 F.3d at 183; see Sierra Club v. Morton, 405 U.S. 727, 739 (1972); Md. Highways Contractors Ass'n, Inc., 933 F.2d at 1250–51. A court may consider a plaintiff-organization's articles of incorporation when it reviews the plaintiff-organization's mission. See S. Walk, 713 F.3d at 183 & n.3.

As for the Alliance's mission, the Alliance's "purposes include, but are not limited to, education, communication, and advocacy on issues of importance to older and retired workers and their families." [D.E. 40-1] 10. The Alliance's articles of incorporation reflect that the Alliance is an issue-advocacy organization, not a voter-advocacy organization. See id. Thus, the court rejects the Alliance's declaration that "the Alliance furthers its mission by ardently working to protect the rights of its members to vote and to have their votes counted." [D.E. 33-1] ¶ 5; see S. Walk, 713 F.3d at 183 n.3 (rejecting plaintiff-organization's allegation of its corporate purpose because "[t]he plain language of its articles of incorporation simply does not reflect this exaggeration"). The 30-day durational residency requirement does not "directly affect and interfere[] with" the Alliance's ability to advocate issues of importance to retirees. All. for Hippocratic Med., 602 U.S. at 395.

Case 5:24-cv-00275-D-RJ    Document 64    Filed 07/19/24    Page 10 of 34

In opposition to this conclusion, the Alliance cites several cases in which the plaintiff-organizations were voter-registration and enfranchisement organizations. See [D.E. 45] 13–14; [D.E. 48] 9–10; see, e.g., Voto Latino v. Hirsch, ___ F. Supp. 3d ___, 2024 WL 230931, at *10 (M.D.N.C. Jan. 21, 2024) ("Plaintiff Voto Latino alleges that its mission is engaging, empowering, and educating its core constituency of Latinx communities throughout the country to ensure that they are enfranchised and included in the democratic process." (cleaned up)); Democracy N.C. v. N.C. State Bd. of Elections, 476 F. Supp. 3d 158, 183 (M.D.N.C. 2020) (describing the League of Women Voters's "mission . . . to encourage Americans to participate actively in government and the electoral process" (quotation omitted)); N.C. State Conf. of NAACP, 283 F. Supp. 3d at 402 (describing the NAACP's "voter-mobilization, voter-protection, and voter-education activities"). The Alliance is not similarly situated to the plaintiff-organizations in those cases. Unlike those plaintiff-organizations, the Alliance fails to demonstrate any voter-registration or enfranchisement activities or missions. Thus, the Alliance fails to show "any similar impediment to [its] advocacy business[]." All. for Hippocratic Med., 602 U.S. at 395. Accordingly, the Alliance lacks organizational standing.

Alternatively, even under the Alliance's organizational standing theory, the Alliance also must demonstrate a drain on or diversion of its resources to address defendants' actions. See [D.E. 48] 10; S. Walk, 713 F.3d at 183; Lane, 703 F.3d at 674–75; Md. Highways Contractors Ass'n, Inc., 933 F.2d at 1250–51; Democracy N.C., 476 F. Supp. 3d at 182.

The Alliance alleges that the 30-day durational residency requirement "requir[es] it to spend additional resources that it would otherwise spend in other ways." Am. Compl. ¶ 18; see [D.E. 33-1] ¶ 8. The Alliance does not specify in its amended complaint or its declaration how the 30-day durational residency requirement drains or diverts its resources. In contrast, in North

11

Carolina State Conference of NAACP, the plaintiff-organization alleged that the defendants' en masse voter challenge "forced [the organization] to divert its valuable and limited resources away from its core mission and planned voter-mobilization, voter-protection, and voter-education activities . . . in order to investigate, respond to, mitigate, and address the concerns of its members." N.C. State Conf. of NAACP, 283 F. Supp. 3d at 402. Accordingly, the Alliance's allegation is too conclusory to support its standing claim. See, e.g., Shield Our Const. Rights & Just. v. Hicks, Civ. No. 09-940, 2009 WL 3747199, at *5 (D. Md. Nov. 4, 2009) (unpublished). Moreover, the Alliance cannot save a conclusory allegation in its amended complaint with a conclusory statement in a declaration. See, e.g., Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 898 (1990).

In opposition, the Alliance argues that it "need not precisely enumerate [its] diversion of resources to obtain preliminary injunctive relief" and cites two cases. [D.E. 48] 10; [D.E. 45] 15–16; see N.C. A. Philip Randolph Inst. v. N.C. State Bd. of Elections, No. 1:20CV876, 2022 WL 446833, at *6–7 (M.D.N.C. Feb. 14, 2022) (unpublished), report and recommendation adopted, 2022 WL 903114 (M.D.N.C. Mar. 28, 2022) (unpublished) ("Randolph II"); N.C. A. Philip Randolph Inst. v. N.C. State Bd. of Elections, No. 1:20CV876, 2020 WL 6488704, at *4–5 (M.D.N.C. Nov. 4, 2020) (unpublished), report and recommendation adopted, 2021 WL 149046 (M.D.N.C. Jan. 15, 2021) (unpublished) ("Randolph I").

Randolph I and II provide no comfort to the Alliance. In Randolph I, "NC APRI attested that it has diverted substantial time and resources from its general voter registration and get-out-the-vote activities to educating individuals with prior convictions." Randolph I, 2020 WL 6488704, at *4 (quotation omitted). Action NC also "attested that it has diverted substantial time and resources from its voter registration and get-out-the-vote activities to reassure eligible individuals that voting will not lead to criminal prosecution." Id. at *5 (quotation omitted).

12

"Ultimately, the time and resources used to address fears surrounding the enforcement of the challenged statute is time away from Plaintiffs' get-out-the-vote activities." Randolph II, 2022 WL 446833, at *7.

In contrast, the Alliance does not "describ[e] a diversion of [its] resources at a similar level of detail" to the organizations in Randolph I and II. [D.E. 48] 10. The Alliance alleges that the 30-day durational residency requirement "undermines the Alliance's get-out-the-vote work in North Carolina." Am. Compl. ¶ 18; see [D.E. 33-1] ¶ 8. The Alliance, however, does not connect that allegation to its alleged resource diversion. Instead, the Alliance merely alleges that the 30-day durational residency requirement requires the Alliance "to spend additional resources that it would otherwise spend in other ways." Am. Compl. ¶ 18; see [D.E. 33-1] ¶ 8. The Alliance leaves the court to guess where those "additional resources" come from, what the Alliance is spending them on, and what "other ways" the Alliance would otherwise spend them. Am. Compl. ¶ 18. Thus, the Alliance fails to establish organizational standing. See, e.g., All. for Hippocratic Med., 602 U.S. at 393–97; Shield Our Const. Rights & Just., 2009 WL 3747199, at *5. Accordingly, the court dismisses the amended complaint for lack of jurisdiction.

## B.

Alternatively, the legislative defendants argue the Alliance's claims are not ripe. "The doctrine of ripeness prevents judicial consideration of issues until a controversy is presented in clean-cut and concrete form." Miller v. Brown, 462 F.3d 312, 318–19 (4th Cir. 2006) (quotation omitted); see Rescue Army v. Mun. Ct. of L.A., 331 U.S. 549, 584 (1947); Scoggins v. Lee's Crossing Homeowners Ass'n, 718 F.3d 262, 269–70 (4th Cir. 2013); Lansdowne on the Potomac Homeowners Ass'n v. OpenBand at Lansdowne, LLC, 713 F.3d 187, 198 (4th Cir. 2013). The ripeness doctrine requires "courts to avoid taking premature judicial action, thereby preventing

13

them from becoming entangled in abstract disagreements." Scoggins, 718 F.3d at 270 (quotation omitted). In considering whether a claim is ripe, courts balance "the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." Miller, 462 F.3d at 319 (quotation omitted). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Texas v. United States, 523 U.S. 296, 300 (1998) (quotations omitted); see Scoggins, 718 F.3d at 270. "The hardship prong is measured by the immediacy of the threat and the burden imposed on the plaintiff." Lansdowne, 713 F.3d at 199 (cleaned up); see Miller, 462 F.3d at 319. "Where an injury is contingent upon a decision to be made by a third party that has not yet acted, it is not ripe as the subject of decision in a federal court." Doe v. Va. Dep't of State Police, 713 F.3d 745, 758 (4th Cir. 2013); see, e.g., Wild Va. v. Council on Env't Quality, 56 F.4th 281, 296 (4th Cir. 2022); Franks v. Ross, 313 F.3d 184, 195 (4th Cir. 2002).

The Alliance alleges that it will be a less-effective advocacy organization if fewer of its members can vote. See Am. Compl. ¶ 18; [D.E. 33-1] ¶ 8; [D.E. 45] 15; [D.E. 48] 9. That injury requires either (1) a non-North Carolinian retiree to move to North Carolina within 30 days of Election Day, join the Alliance, and attempt to vote in North Carolina during the 2024 elections; or (2) a current Alliance member to move precincts in North Carolina within 30 days of Election Day and attempt to vote in his or her new precinct during the 2024 elections. In other words, the Alliance's alleged injuries are "contingent upon a decision to be made by a third party that has not yet acted." Doe, 713 F.3d at 758; see Wild Va., 56 F.4th at 296. Thus, "to the extent [the Alliance] express[es] fears related to" some retirees' ability to vote in the 2024 elections in North Carolina, "those fears have not yet ripened into actionable injuries." Wild Va., 56 F.4th at 296. Accordingly,

14

the Alliance's claims are not ripe, and the court dismisses its amended complaint for lack of jurisdiction.

III.

Alternatively, the court assumes without deciding that the Alliance has established its standing to bring this action and that its claims are ripe. The legislative defendants move to dismiss the Alliance's complaint for failure to state a claim. See [D.E. 37]; Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to [the nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 352 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 576 U.S. 155 (2015). A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79. Rather, a plaintiff's factual allegations must "nudge[] [its] claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678–79.

"Determining whether a complaint states a plausible claim for relief . . . [is] a context specific task that requires the reviewing court to draw on judicial experience and common sense."

15

Iqbal, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint does not suffice. Id.

When evaluating a motion to dismiss, a court considers the pleadings and any materials "attached or incorporated into the complaint." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011); see Fed. R. Civ. P. 10(c); Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165–66 (4th Cir. 2016); Thompson v. Greene, 427 F.3d 263, 268 (4th Cir. 2005). A court also may consider a document submitted by a moving party if it is "integral to the complaint and there is no dispute about the document's authenticity" without converting the motion into one for summary judgment. Goines, 822 F.3d at 166. "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . . , the exhibit prevails." Id. (quotation omitted); see Fayetteville Invs. v. Com. Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991). Additionally, a court may take judicial notice of public records. See, e.g., Fed. R. Evid. 201; Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007); Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

A.

The Alliance brings a claim under 42 U.S.C. § 1983 and alleges that the 30-day durational residency requirement violates the First and Fourteenth Amendments of the United States Constitution. See Am. Compl. ¶¶ 53–59. "To state a claim under [section] 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988); see Philips, 572 F.3d at 180. Additionally, a section 1983 plaintiff must plausibly allege the personal involvement of a defendant. See, e.g., Iqbal, 556 U.S.

Case 5:24-cv-00275-D-RJ    Document 64    Filed 07/19/24    Page 16 of 34

at 676–77; Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691–94 (1978); Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985).

When considering a constitutional challenge to a state election law, the court "begin[s] with the uncontroversial proposition that the legislature in each state of our federal system possesses the presumptive authority to regulate elections within that state's sovereign territory." Libertarian Party of Va. v. Alcorn, 826 F.3d 708, 714 (4th Cir. 2016). The Constitution grants the states the power to prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, § 4, cl. 1; see Clingman v. Beaver, 544 U.S. 581, 586 (2005) (describing this power as "broad"). Moreover, the Constitution provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" who will elect the President and Vice President of the United States. U.S. Const. art. II, § 1, cl. 2. "And a state's authority to regulate elections for its own offices is simply a basic incident of our federal system." Libertarian Party of Va., 826 F.3d at 715.

In light of these principles, courts apply the Anderson-Burdick framework when considering constitutional challenges to state election laws. See, e.g., Marcellus v. Va. State Bd. of Elections, 849 F.3d 169, 175 (4th Cir. 2017). In Anderson v. Celebrezze, 460 U.S. 780 (1983), the Supreme Court stated that:

> [c]onstitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions. Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

17

Id. at 789 (citation omitted); see Marcellus, 849 F.3d at 175. In Burdick v. Takushi, 504 U.S. 428 (1992), the Court discussed this framework and rejected the argument "that a law that imposes any burden upon the right to vote must be subject to strict scrutiny." Id. at 432. The Court explained that:

> [c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.

Id. at 433 (quotation omitted). Since "[e]lection laws will invariably impose some burden upon individual voters," it "would tie the hands of States seeking to assure that elections are operated equitably and efficiently" if courts "subject[ed] every voting regulation to strict scrutiny." Id. Instead, the "rigorousness" of the court's inquiry "depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." Id. at 434.

The court's "inquiry is flexible and depends upon the extent to which a challenged regulation burdens" the asserted rights. Libertarian Party of Va., 826 F.3d at 716 (quotations omitted); see Burdick, 504 U.S. at 434. "Laws imposing modest burdens are usually justified by a state's important regulatory interests." Libertarian Party of Va., 826 F.3d at 716–17 (quotations omitted); see, e.g., S.C. Green Party v. S.C. State Election Comm'n, 612 F.3d 752, 759 (4th Cir. 2010). "Laws imposing severe burdens, on the other hand, must be narrowly drawn to advance a state interest of compelling importance." Libertarian Party of Va., 826 F.3d at 717 (quotations omitted); see Burdick, 504 U.S. at 434; Marcellus, 849 F.3d at 175; McLaughlin v. N.C. Bd. of Elections, 65 F.3d 1215, 1221 (4th Cir. 1995). Courts employ this framework "[w]hen facing any constitutional challenge to a state's election laws." Fusaro v. Cogan, 930 F.3d 241, 257 (4th Cir. 2019).

Initially, the court determines whether, and how much, the 30-day durational residency requirement burdens voters' First and Fourteenth Amendment rights. In Luft v. Evers, 963 F.3d 665 (7th Cir. 2020), the Seventh Circuit considered Wisconsin's 28-day durational residency requirement. See id. at 675–76. Wisconsin allows citizens to register to vote "at the polling place immediately before casting a ballot" on Election Day. Id. at 672; see Wis. Stat. § 6.55(2)(a). When voters register, they must certify they have resided in their precinct "for at least 28 consecutive days immediately preceding this election." Wis. Stat. § 6.55(2)(a). In Luft, the district court analyzed Wisconsin's 28-day durational residence requirement under the Anderson-Burdick framework and found it unconstitutional. See Luft, 963 F.3d at 675. The Seventh Circuit reversed and explained:

> Wisconsin's 28-day window is close to the national norm and less than the 30-day window that is subject to a safe harbor for federal elections. It is less than the 50-day window that the Supreme Court held to be constitutional for Arizona. Plaintiffs have not identified any feature of Wisconsin's law that makes a 28-day window more onerous in that state than 50 days was in Arizona. Although Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), holds that 90 days in Tennessee is too long, it added that 30 days is permissible. . . . It's true that Wisconsin's election system differs from those of Arizona and Tennessee, but most differences that we perceive make it easier to vote in Wisconsin.

Id. at 676 (citations omitted); see 52 U.S.C. § 20302(a)(2); Marston v. Lewis, 410 U.S. 679, 680–81 (1973) (per curiam); Dunn, 405 U.S. at 348–49 & n.19. Consistent with Luft, North Carolina's 30-day durational residency requirement poses only a modest burden on voting rights because North Carolina's 30-day durational residency requirement resembles Wisconsin's 28-day durational residency requirement. Compare Wis. Stat. § 6.55, with N.C. Gen. Stat. §§ 163-55(a), 163-82.6(d).[2]

---

[2] The legislative defendants cite Luft throughout their briefs. See [D.E. 38] 25–26; [D.E. 40] 24–25; [D.E. 47] 16. The Alliance does not cite Luft at all.

19

In opposition to this conclusion, the Alliance cites Dunn and argues that the court must use strict scrutiny to analyze the 30-day durational residency requirement. See [D.E. 34] 17–21; [D.E. 45] 26–31; [D.E. 48] 13–16. The Alliance contends that the Anderson-Burdick framework does not govern the court's analysis because the "Supreme Court has never questioned or overruled Dunn's holding that durational residency requirements are subject to strict scrutiny." [D.E. 45] 27. Alternatively, the Alliance argues that even if the Anderson-Burdick framework governs, that framework does "not undermine[]" Dunn's "strict-scrutiny standard" for evaluating the 30-day durational residency requirement. [D.E. 48] 16.

In Dunn, the Court stated that "durational residence laws must be measured by a strict equal protection test: they are unconstitutional unless the State can demonstrate that such laws are necessary to promote a compelling governmental interest." Dunn, 405 U.S. at 342. Dunn, however, predates the Anderson-Burdick framework,[3] which the Fourth Circuit has prescribed for "any constitutional challenge to a state's election laws." Fusaro, 930 F.3d at 257 (emphasis added). Moreover, Dunn comports with Anderson-Burdick. In Dunn, Tennessee required voters to live in the state for a year and the county for three months before they could vote. See Dunn, 405 U.S. at 334. Such a law would face strict scrutiny under the Anderson-Burdick framework. See Libertarian Party of Va., 826 F.3d at 717. Furthermore, in Dunn, the Court held that a 30-day durational residency requirement was a "reasonable way[] to achieve [Tennessee's] goals with a lesser burden on constitutionally protected activity." Dunn, 405 U.S. at 343; see id. at 348. Thus, after Anderson-Burdick, Dunn demonstrates that a three-month or year-long durational residency

---

[3] The Alliance cites some district court cases in which the courts invalidated durational residency requirements using strict scrutiny. See [D.E. 34] 20–21; [D.E. 48] 16; [D.E. 45] 30; Meyers v. Jackson, 390 F. Supp. 37, 42–43 (E.D. Ark. 1975) (three-judge court); Fisher v. Herseth, 374 F. Supp. 745, 747 (D.S.D. 1974); Hinnant v. Sebesta, 363 F. Supp. 398, 400 (M.D. Fla. 1973). These cases, however, also predate Anderson-Burdick. Thus, they are not persuasive.

20

requirement is a "severe" burden warranting strict scrutiny, but a 30-day durational residency requirement is a "modest" burden warranting less-exacting review. See Libertarian Party of Va., 826 F.3d at 716–17.

After the Supreme Court decided Dunn, but before it created the Anderson-Burdick framework, the Supreme Court decided Marston. In Marston, Arizona imposed a 50-day durational residency requirement and a 50-day voter registration cutoff. See Marston, 410 U.S. at 679. A three-judge district court permanently enjoined "enforcement of these or any other greater-than-30-day residency and registration requirements in any election held after November 1972." Id. The Supreme Court reversed in a three-page per curiam decision. See id. at 680–82. In doing so, the Court deferred to the Arizona legislature's judgment about how long volunteers needed to verify registration affidavits and found that 50 days was acceptably shorter than Tennessee's much longer durational residency requirement in Dunn. See id. Three justices dissented and would have affirmed the district court's judgment that Arizona failed to adequately justify a durational residency requirement and registration cutoff longer than 30 days. See id. at 682–85 (Marshall, J., dissenting). The dissent complained that the Marston majority applied less-exacting review than the Court applied in Dunn. See id. All nine justices agreed, however, that a 30-day durational residency requirement posed an acceptable burden on constitutional activity. See id. Thus, Marston confirms how Dunn applies within the Anderson-Burdick framework.

In Luft, the Seventh Circuit used the Anderson-Burdick framework to consider Wisconsin's 28-day durational residency requirement. See Luft, 963 F.3d at 675–76. The Seventh Circuit compared Wisconsin's 28-day durational residency requirement to the durational residency requirements at issue in Dunn and Marston and held that Wisconsin's law did not violate the Constitution. See id. These cases demonstrate that North Carolina's 30-day durational residency

21

requirement imposes only a "modest" burden on constitutional activity justifying less-exacting review. See Luft, 963 F.3d at 675–76; Libertarian Party of Va., 826 F.3d at 716–17.

In opposition, the Alliance argues that "[e]ven under Anderson-Burdick, laws that totally deny the electoral franchise to a particular class of residents are subject to strict scrutiny." [D.E. 45] 27–28 (cleaned up); see Rosario v. Rockefeller, 410 U.S. 752, 757 (1973); Greidinger v. Davis, 988 F.2d 1344, 1350–51 (4th Cir. 1993). The cases the Alliance cites, however, do not help the Alliance. Rosario, like Dunn, predates the Anderson-Burdick framework. In Greidinger, the Fourth Circuit considered a Virginia law that subjected voters' Social Security numbers to public inspection in the Office of the General Registrar and allowed entities, such as political parties, to request those Social Security numbers as part of voter registration lists. See Greidinger, 988 F.2d at 1345. The Fourth Circuit described the development of the Supreme Court's election cases. See id. at 1349–50. The Fourth Circuit observed that between 1945 and 1975, the Supreme Court had employed "traditional equal protection strict scrutiny analysis" where "the state law under attack prohibited an identified class of persons from voting." Id. The Fourth Circuit then observed that the "Supreme Court's continued reliance on the 'absolute denial' distinction made in Rosario is called into question when examining recent ballot access decisions." Id. at 1350. In particular, the Fourth Circuit described how Anderson changed the applicable analysis. See id. at 1350–52. Ultimately, the Fourth Circuit held that the proper analysis was not strict scrutiny, but a version of what later became the Anderson-Burdick framework:

> Anderson . . . [is] also illustrative of the Supreme Court's recent focus on the degree of the burden imposed on the exercise of associational or voting rights as opposed to the "absolute denial" of associational or voting rights which the Court found critical in Rosario. Thus, the critical distinction . . . is whether the statute at issue imposes a substantial burden on the associational rights or voting rights at stake. . . . If a substantial burden exists, a common sense reading of the cases . . . suggests that the restrictions on the right to vote must serve a compelling state interest and be narrowly tailored to serve that state interest.

22

Id. at 1352. Moreover, Greidinger does not hold, as the Alliance contends, that this court must subject North Carolina's 30-day durational residency requirement to strict scrutiny. See [D.E. 45] 27–28. Instead, Greidinger repudiates the language from Rosario that the Alliance argues Greidinger endorses. See id.; Greidinger, 988 F.2d at 1352. Thus, the court rejects the Alliance's argument.

Next, the Alliance observes that North Carolina's 30-day durational residency requirement is earlier than its registration cutoff. See [D.E. 45] 28–29; [D.E. 48] 15. According to the Alliance, this difference between the 30-day durational residency requirement and the registration cutoff dooms the 30-day durational residency requirement. See [D.E. 45] 28–29; [D.E. 48] 15. Not so. The Alliance's argument concerns North Carolina's tailoring of the 30-day durational residency requirement. Under the Anderson-Burdick framework, however, the court must first determine the extent of the challenged law's burden on constitutional rights before it decides how closely to scrutinize the tailoring. See McLaughlin, 65 F.3d at 1221.

Like Wisconsin's electoral scheme at issue in Luft, North Carolina's voter registration cutoff is later than its durational residency requirement cutoff. See N.C. Gen. Stat. §§ 163-55(a), 163-82.6(d). The Alliance concedes that North Carolina's 30-day durational residency requirement would be lawful if North Carolina's registration cutoff also was 30 days before Election Day. See Am. Compl. ¶ 42. In 2016, however, the Fourth Circuit enjoined North Carolina from repealing same-day registration because, inter alia, such a repeal would make it harder for some citizens to vote. See N.C. State Conf. of NAACP v. McCrory, 831 F.3d 204, 239 (4th Cir. 2016). Thus, North Carolina's later registration cutoff "make[s] it easier to vote" in North Carolina relative to the Alliance's proposed lawful alternative or Arizona's 50-day cutoff in Marston. Luft, 963 F.3d at 676 (emphasis added). Rather than demonstrate a "severe" burden, the Alliance's

23

argument confirms that North Carolina's 30-day durational residency requirement warrants less-exacting review.

As for the severity of the burden, North Carolina allows a person who moves from one precinct to another in North Carolina to vote in their old precinct for 30 days after he or she moves. See N.C. Gen. Stat. § 163-55(a). Thus, North Carolina does not "totally deny the electoral franchise" to North Carolinians who move within North Carolina. [D.E. 45] 27. Instead, the voter can still vote in the same national and statewide elections and may (depending on the distance of the move) be able to vote in many of the same state and local elections that would otherwise appear on his or her new ballot. Moreover, the VRA allows a voter to vote for president and vice president in his or her old state if he or she moves to a new state, like North Carolina, within 30 days of Election Day. See 52 U.S.C. § 10502(e). Thus, North Carolina does not "totally deny the electoral franchise" to new North Carolinians either. [D.E. 45] 27. North Carolina's 30-day durational residency requirement only modestly burdens a voter's constitutional rights.

Once a court determines that a challenged election law imposes only a modest burden on constitutional rights, "the State's asserted regulatory interests need only be sufficiently weighty to justify the limitation imposed on the party's rights." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 364 (1997) (quotation omitted); see Norman v. Reed, 502 U.S. 279, 288–89 (1992); Burdick, 504 U.S. at 434. The court does not "require elaborate, empirical verification of the weightiness of the State's asserted justifications." Timmons, 520 U.S. at 364; see Libertarian Party of Va., 826 F.3d at 719.

The legislative defendants advance several important interests. The 30-day durational residency requirement reflects "the General Assembly's judgment about what constitutes an ample period of time for the State to complete whatever administrative tasks are necessary to prevent

24

fraud." [D.E. 38] 27 (quotations omitted). The 30-day durational residency requirement "serves North Carolina's legitimate purpose to determine whether certain persons in the community are bona fide residents by dissuading would-be fraudulent voters who remain in a false locale for a short time before an election." Id. (quotations omitted). Moreover, "making sure that a voter resided in North Carolina for [30 days] serves the State's interest in providing for an educated electorate with at least some minimal ties to the State" because "campaign spending and voter education occur largely during the month before an election." Id. (quotation omitted). Each of these interests is sufficiently weighty to support the 30-day durational residency requirement. See, e.g., Dunn, 405 U.S. at 348, 351–52, 358; Luft, 963 F.3d at 675–76.

In opposition, the Alliance contends that "Dunn addresses—and rejects as inadequate—all of [the legislative defendants'] proffered justifications." [D.E. 48] 14; see [D.E. 45] 28–29. In Dunn, however, the Court did not hold that Tennessee's asserted interests were not important. Rather, the Court recognized that "the prevention of . . . fraud is a legitimate and compelling government goal." Dunn, 405 U.S. at 345; see also Marston, 410 U.S. at 680. Employing strict scrutiny, the Court disapproved of the tailoring of Tennessee's durational residency requirement. See, e.g., Dunn, 405 U.S. at 353 (concluding "that the waiting period is not the least restrictive means necessary for preventing fraud"), 360 (concluding "there is simply too attenuated a relationship between the state interest in an informed electorate and the fixed requirement that voters must have been residents in the State for a year and the county for three months"). As discussed, this court does not employ strict scrutiny. Accordingly, the court rejects this argument.

Finally, "[h]aving identified the asserted state interests furthered by" the 30-day durational residency requirement, the court must "weigh them against the law's burdens on the plaintiff's First and Fourteenth Amendment rights." Libertarian Party of Va., 826 F.3d at 721. "[T]he State's

25

important regulatory interests are generally sufficient to justify the restrictions." Burdick, 504 U.S. at 434 (quotation omitted); see Anderson, 460 U.S. at 788. North Carolina's several important interests outweigh the 30-day durational residency requirement's modest burden on First and Fourteenth Amendment rights. Accordingly, the Alliance fails to plausibly allege that the 30-day durational residency requirement violates the First and Fourteenth Amendments. Thus, the court dismisses the claim. See, e.g., Luft, 963 F.3d at 675–76; Sarvis v. Judd, 80 F. Supp. 3d 692, 697–709 (E.D. Va. 2015), aff'd sub nom. Libertarian Party of Va., 826 F.3d 708.

B.

The Alliance asserts a claim under section 1983 and alleges that the 30-day durational residency requirement violates Section 202 of the VRA. See Am. Compl. ¶¶ 45–52. The relevant prohibition reads in its entirety:

> No citizen of the United States who is otherwise qualified to vote in any election for President and Vice President shall be denied the right to vote for electors for President and Vice President, or for President and Vice President, in such election because of the failure of such citizen to comply with any durational residency requirement of such State or political subdivision; nor shall any citizen of the United States be denied the right to vote for electors for President and Vice President, or for President and Vice President, in such election because of the failure of such citizen to be physically present in such State or political subdivision at the time of such election, if such citizen shall have complied with the requirements prescribed by the law of such State or political subdivision providing for the casting of absentee ballots in such election.

52 U.S.C. § 10502(c). The remainder of Section 202 reads:

> For the purposes of this section, each State shall provide by law for the registration or other means of qualification of all duly qualified residents of such State who apply, not later than thirty days immediately prior to any presidential election, for registration or qualification to vote for the choice of electors for President and Vice President or for President and Vice President in such election; and each State shall provide by law for the casting of absentee ballots for the choice of electors for President and Vice President, or for President and Vice President, by all duly qualified residents of such State who may be absent from their election district or unit in such State on the day such election is held and who have applied therefor not later than seven days immediately prior to such election and have returned such

26

ballots to the appropriate election official of such State not later than the time of closing of the polls in such State on the day of such election.

If any citizen of the United States who is otherwise qualified to vote in any State or political subdivision in any election for President and Vice President has begun residence in such State or political subdivision after the thirtieth day next preceding such election and, for that reason, does not satisfy the registration requirements of such State or political subdivision he shall be allowed to vote for the choice of electors for President and Vice President, or for President and Vice President, in such election, (1) in person in the State or political subdivision in which he resided immediately prior to his removal if he had satisfied, as of the date of his change of residence, the requirements to vote in that State or political subdivision, or (2) by absentee ballot in the State or political subdivision in which he resided immediately prior to his removal if he satisfies, but for his nonresident status and the reason for his absence, the requirements for absentee voting in that State or political subdivision.

Id. § 10502(d)–(e).

The parties do not cite, and the court has not located, any binding or persuasive constructions of Section 202 from other courts. Instead, the Alliance and legislative defendants make textual arguments about Section 202. See [D.E. 34] 15–16; [D.E. 38] 23–25; [D.E. 40] 22–24; [D.E. 45] 22–26; [D.E. 47] 13–15; [D.E. 48] 12–13.

Subsection (c) does not prohibit or abolish durational residency requirements.[4] Instead, subsection (c) declares that "[n]o citizen of the United States who is otherwise qualified to vote in any election for President and Vice President shall be denied the right to vote for electors . . . in such election because of the failure of such citizen to comply with any durational residency requirement of such State or political subdivision." 52 U.S.C. § 10502(c) (emphasis added). To "deny" means to "refuse to grant or accept." Deny, Black's Law Dictionary 392 (5th ed. 1979);

---

[4] Subsection (b) states that "Congress declares that in order to secure and protect the above-stated rights of citizens under the Constitution, . . . it is necessary (1) to completely abolish the durational residency requirement as a precondition to voting for President and Vice President." 52 U.S.C. § 10502(b). Subsections (a) and (b) of Section 202 are not "couched in mandatory, rather than precatory, terms." Blessing v. Freestone, 520 U.S. 329, 341 (1997). Thus, subsections (a) and (b) cannot support a cause of action under section 1983. See id. at 340–41.

27

*see also* Deny, Webster's Deluxe Unabridged Dictionary 487 (2d ed. 1979) (defining "deny," inter alia, as "to refuse to grant; to withhold; . . . to refuse access to"); Deny, 1 Oxford English Dictionary 688 (compact ed. 1971) (defining "deny," inter alia, as "[t]o refuse or withhold (anything asked for, claimed or desired); to refuse to give or grant"). Thus, a state violates Section 202 only if its durational residency requirement bars a citizen from voting for president. See 52 U.S.C. § 10502(c).

Courts read "the words of a statute . . . in their context and with a view to their place in the overall statutory scheme." King v. Burwell, 576 U.S. 473, 492 (2015) (quotation omitted). Subsection (e) provides that if a citizen moves to a new state (or political subdivision) within 30 days of Election Day and thereby "does not satisfy the registration requirements" of the citizen's new state (or political subdivision), the citizen's old state (or political subdivision) must allow the citizen to vote for electors for president and vice president. 52 U.S.C. § 10502(e). When subsections (c) and (e) are read together, a citizen's "right to vote for electors for President and Vice President" is not "denied" under subsection (c) by a 30-day durational residency requirement because subsection (e) provides an avenue for citizens to vote for president and vice president if they move within that time. Id. § 10502(c), (e).[5] If Congress intended for subsection (c) to render all durational residency requirements invalid, it would not have needed to add subsection (e), which presumes enforcement of 30-day (or shorter) durational residency requirements. The Alliance's reading of subsection (c) renders superfluous subsection (e). See, e.g., Pulsifer v. United States, 601 U.S. 124, 141–46 (2024); Ysleta Del Sur Pueblo v. Texas, 596 U.S. 685, 698–

---

[5] The same is true for voters who move from one precinct in North Carolina to another precinct in North Carolina. North Carolina requires the old precinct to allow the voter to vote in that precinct for 30 days after the voter's move. See N.C. Gen. Stat. § 163-55(a). Thus, "the hypothetical voter will still be able to participate in upcoming elections, even if they are not yet eligible to vote at their new address." [D.E. 43] 7.

99 (2022); Republic of Sudan v. Harrison, 587 U.S. 1, 12 (2019); United States v. Jicarilla Apache Nation, 564 U.S. 162, 185 (2011) ("[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." (quotation omitted)). Thus, Section 202 permits a state to impose a durational residency requirement of up to 30 days.

Two examples illustrate how subsections (c) and (e) interact. State A has a 30-day durational residency requirement. In Example 1, Citizen moves from State B to State A 35 days before Election Day. In Example 2, Citizen moves from State B to State A 28 days before Election Day.

In Example 1, Citizen can register to vote and vote in State A in the presidential election. Thus, Citizen has not been "denied" the right to vote in the presidential election. 52 U.S.C. § 10502(c). In Example 2, Citizen cannot register to vote and vote in State A in the presidential election because of State A's 30-day durational residency requirement. The VRA, however, requires State B to allow Citizen to vote in the presidential election in State B. See id. § 10502(e). Thus, Citizen has not been "denied" the right to vote in the presidential election. Id. § 10502(c).

Under subsection (d) of Section 202, "each State shall provide by law for the registration or other means of qualification of all duly qualified residents of such State who apply, not later than thirty days immediately prior to any presidential election, for registration or qualification to vote for the choice of electors for President and Vice President." Id. § 10502(d) (emphasis added). As a qualification for voting, states may "see that all applicants for the vote actually fulfill the requirements of bona fide residence." Carrington v. Rash, 380 U.S. 89, 96 (1965); cf. Dunn, 405 U.S. at 334 ("The subject of this lawsuit is the durational residence requirement. Appellee does not challenge Tennessee's power to restrict the vote to bona fide Tennessee residents."). Thus, Section 202 expressly allows states to impose a bona fide residency requirement 30 days before

Case 5:24-cv-00275-D-RJ   Document 64   Filed 07/19/24   Page 29 of 34

Election Day. Asking prospective voters whether they reside in the state when they register 30 days before Election Day and closing registration 30 days before Election Day produces the same result as allowing registration up to Election Day and asking registrants whether they have resided in the state for the previous 30 days. If, however, the court adopted the Alliance's reading of subsections (c) and (e), Section 202 would contain a loophole in which the former would be lawful while the latter would be unlawful. Accordingly, subsection (d) comports with this court's interpretation of subsections (c) and (e).

The Alliance concedes that subsection (e) "provides that voters barred from voting in their new place of residence . . . can vote in their old place of residence." [D.E. 48] 13; see [D.E. 45] 25. The Alliance, however, contends that subsection (e) only protects "voters who miss a registration cutoff," not "voters who move in time to register, but do not satisfy the 30-Day Residency Requirement." [D.E. 48] 13 (emphasis in original). According to the Alliance, "the voters whose rights are at issue in this lawsuit . . . could register on the 29th or 28th day before election day, or using same-day registration during early voting," but the 30-day durational residency requirement "bars such voters from voting" in violation of Section 202. [D.E. 45] 25.

Subsection (e) contemplates 30-day durational residency requirements as part of states' registration requirements. See 52 U.S.C. § 10502(e) (providing a safe harbor for citizens who change residences within 30 days of Election Day "and, for that reason, do[] not satisfy the registration requirements" of their new residence (emphasis added)). The Alliance alleges that "[i]n order to register to vote, voters must attest to meeting [North Carolina's durational] residency requirement on their registration forms." Am. Compl. ¶ 24. North Carolina's voter registration application requires an applicant to attest that he or she "will have lived at the residence identified on this form for 30 days before the date of the election in which [he or she] intend[s] to vote."

30

North Carolina Voter Registration Application 1, https://s3.amazonaws.com/dl.ncsbe.gov/Voter_Registration/NCVoterRegForm_06W.pdf (last visited July 19, 2024). North Carolina subjects citizens to criminal penalties if they fraudulently or falsely attest that they will have met the 30-day durational residency requirement before voting. See id.; N.C. Gen. Stat. § 163-82.4(c)(1). Thus, a citizen could not register to vote in North Carolina if he or she moved to North Carolina within 30 days of Election Day 2024 and intended to vote in the 2024 presidential election. See, e.g., Am. Compl. ¶ 31 (alleging voters who move to North Carolina or to a new precinct in North Carolina within 30 days of Election Day "cannot truthfully make the required attestations to register to vote at their new place of residence"); Qualifications to Register to Vote, https://www.ncsbe.gov/registering/who-can-register (last visited July 19, 2024) ("To register to vote in North Carolina, you must: . . . [l]ive in the county where you are registering, and have resided there for at least 30 days prior to Election Day.").[6] In other words, that citizen would not meet the 30-day durational residency requirement "and, for that reason, [would] not satisfy the registration requirements" of North Carolina. 52 U.S.C. § 10502(e). Instead, Section 202 requires the citizen's former precinct to allow the citizen to vote for president and vice president in that precinct. See id. Thus, that citizen would not be "denied" the ability to vote for president and vice president. Accordingly, the Alliance fails to plausibly allege that the 30-day durational residency requirement violates Section 202 of the VRA. See id. § 10502(c).

The Alliance argues that the court's interpretation of Section 202 conflicts with the broad findings and purposes set forth in subsections (a) and (b) of Section 202. See [D.E. 45] 22–24; 52 U.S.C. § 10502(a)–(b). No law, however, "pursues its stated purpose at all costs." Henson v.

_____

[6] Conversely, a citizen could move to North Carolina within 30 days of Election Day 2024 and immediately apply to register to vote, provided the applicant did not intend to vote until he or she resided in North Carolina for 30 days. See North Carolina Voter Registration Application 1.

31

Santander Consumer USA Inc., 582 U.S. 79, 89 (2017) (quotation omitted); see Pulsifer, 601 U.S. at 152; Luna Perez v. Sturgis Pub. Schs., 598 U.S. 142, 150 (2023). "Legislation is, after all, the art of compromise, the limitations expressed in statutory terms often the price of passage . . . ." Henson, 582 U.S. at 89; see Luna Perez, 598 U.S. at 150. Thus, "it is quite mistaken to assume . . . that whatever might appear to further the statute's primary objective must be the law." Henson, 582 U.S. at 89 (cleaned up); see Luna Perez, 598 U.S. at 150; Rodriguez v. United States, 480 U.S. 522, 526 (1987) (per curiam). Accordingly, the court rejects the Alliance's argument and dismisses the amended complaint.

## IV.

Alternatively, even if the Alliance's claims eke across the plausibility line, the Alliance is not entitled to a preliminary injunction. "A preliminary injunction is an extraordinary equitable remedy that is never awarded as of right." Starbucks Corp. v. McKinney, 144 S. Ct. 1570, 1576 (2024) (quotations omitted); see Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). Plaintiffs seeking a preliminary injunction must "demonstrate that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest." Pashby v. Delia, 709 F.3d 307, 320 (4th Cir. 2013); see Starbucks Corp., 144 S. Ct. at 1576; Winter, 555 U.S. at 20; Centro Tepeyac v. Montgomery Cnty., 722 F.3d 184, 188 (4th Cir. 2013) (en banc). Courts consider each factor separately, and the movant must prove each factor "as articulated." Pashby, 709 F.3d at 320–21 (quotation omitted).

As for the Alliance's likelihood of success on the merits, as discussed, North Carolina's important state interests outweigh the 30-day durational residency requirement's modest burden on First and Fourteenth Amendment rights. Thus, the Alliance is not likely to succeed on its

32

constitutional claim. Moreover, as discussed, the 30-day durational residency requirement does not violate Section 202. Thus, the Alliance is not likely to succeed on its VRA claim.

As for irreparable harm, "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is likely in the absence of an injunction." Winter, 555 U.S. at 22 (emphasis in original). The Alliance contends that its rights will be irreparably harmed because the 30-day durational residency requirement infringes voters' fundamental rights and impairs the Alliance's programs. See [D.E. 34] 22–23.

The Alliance is unlikely to succeed on the merits of its claims. Accordingly, the Alliance fails to demonstrate that it will suffer irreparable harm absent a preliminary injunction against the 30-day durational residency requirement in the 2024 elections. See, e.g., Miranda v. Garland, 34 F.4th 338, 365 (4th Cir. 2022); League of United Latin Am. Citizens v. Abbott, 601 F. Supp. 3d 147, 183 (W.D. Tex. 2022) (three-judge court); Pierce v. N.C. State Bd. of Elections, ___ F. Supp. 3d ___, 2024 WL 307643, at *28 (E.D.N.C. Jan. 26, 2024), aff'd, 97 F.4th 194 (4th Cir. 2024); Dhillon v. Wobensmith, 475 F. Supp. 3d 456, 462 (D. Md. 2020); Talleywhacker, Inc. v. Cooper, 465 F. Supp. 3d 523, 542 (E.D.N.C. 2020); Aslanturk v. Hott, 459 F. Supp. 3d 681, 700 (E.D. Va. 2020).

As for the balance of equities and the public interest, "[t]hese factors merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009); see Miranda, 34 F.4th at 365. After considering the evidence that the parties presented concerning the Alliance's motion for a preliminary injunction, the Alliance fails to demonstrate that it is likely to succeed on the merits of its constitutional claim or its Section 202 claim or that it will suffer irreparable injury absent the requested preliminary injunction. By contrast, "enjoining North Carolina (through its public officials) from enforcing [the 30-day durational residency requirement in the 2024

33

elections] would constitute a form of irreparable injury." Pierce, 2024 WL 307643, at *29 (quotation omitted); see Maryland v. King, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); Sharma v. Hirsch, No. 5:23-CV-506, 2023 WL 7406791, at *14 (E.D.N.C. Oct. 30, 2023) (unpublished); Law v. Gast, 641 F. Supp. 3d 580, 604 (S.D. Iowa 2022).

Inequity would result if the court enjoined North Carolina's 30-day durational residency requirement in the 2024 elections. Thus, the balance of equities and the public interest weigh in favor of the defendants and against a preliminary injunction. See, e.g., Pierce, 2024 WL 307643, at *29; N. Va. Hemp & Agric. LLC v. Virginia, ___ F. Supp. 3d ___, 2023 WL 7130853, at *13 (E.D. Va. Oct. 30, 2023), appeal filed, No. 23-2192 (4th Cir. Nov. 15, 2023); Sharma, 2023 WL 7406791, at *14. Accordingly, the court denies the Alliance's motion for a preliminary injunction. In light of this conclusion, the court does not address the parties' arguments about laches or the Purcell principle. Cf. Merrill v. Milligan, 142 S. Ct. 879, 880–82 (2022) (Kavanaugh, J., concurring in grant of application for stays); Purcell v. Gonzalez, 549 U.S. 1, 4–6 (2006) (per curiam).

V.

In sum, the court GRANTS the legislative defendants' motion to dismiss [D.E. 37], DISMISSES WITHOUT PREJUDICE plaintiff's amended complaint, DENIES plaintiff's motion for a preliminary injunction [D.E. 33], and DISMISSES AS MOOT plaintiff's motion to consolidate [D.E. 49].

SO ORDERED. This 19 day of July, 2024.

JAMES C. DEVER III
United States District Judge

34